**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

BOBBY GENE HANKINS                                                                           PLAINTIFF

v.                                              No. 4:11CV00428 JLH

STANDARD INSURANCE COMPANY                                                     DEFENDANT

**OPINION AND ORDER**

This is an ERISA action in which Bobby Gene Hankins seeks to recover benefits under the long-term disability plan offered by his former employer, Stephens Inc., through Standard Insurance Company. The parties have submitted an administrative record and briefed the issues, so the case is ripe for decision. For the following reasons, Standard's decision to deny Hankins' claim for long-term disability benefits is affirmed.

**I.**

In April 2002, Bobby Gene Hankins began working as the director of commercial security at Stephens, Inc. (Adm. R. 351, 381). In that position, Hankins managed a staff of 30 security personnel while reporting to the Stephens vice president and chief security officer. (*Id.*). Stephens summarized Hankins' position as requiring him:

> To plan, organize, direct and control the security policies, procedures and programs for all commercial locations in the area of facility security in order to ensure the safety and security of employees and assets; to provide investigation and other security services as required in this capacity.

(Adm. R. 381). Hankins' job description also contained a lengthy list of "Essential Duties and Responsibilities" that include potentially physical requirements such as "responding to all emergency and crisis situations as necessary, . . . transporting and assisting incapacitated persons, interceding in physical disturbances, subduing violent individuals, . . . assisting victims of offenses," participating in investigations, making arrests, and providing "'back-up' support to law enforcement

agencies as necessary." (Adm. R. 381-82).[1] In addition, Stephens required Hankins to "be able to perform each essential duty satisfactorily." (Adm. R. 382). In order to evaluate his physical capacity for the aforementioned duties, Stephens periodically required Hankins to: (1) walk or run 1.5 miles in under 15:54 minutes; (2) run 300 meters in under 66 seconds; (3) jump at least 15.5 inches vertically; (4) bench press at least 78 percent of his body weight; and (5) perform at least 30 sit-ups in one minute. (Adm. R. 383).

Through his employment with Stephens, Hankins was covered by the "Group Long Term Disability Insurance Policy" provided by Standard. (Adm. R. 9). The Policy states that a person is entitled to disability benefits during the "Own Occupation Period" if he meets the "Own Occupation Definition of Disability." (Adm. R. 13, 18). A person meets this definition, in part, by being "unable to perform with reasonable continuity the Material Duties of [his] Own Occupation." (Adm. R. 18).

On October 15, 2009, Hankins was running at work in the fitness program for Stephens' security personnel when he heard a pop and felt a severe pain in his right buttock. (Adm. R. 114, 208, 230). After undergoing an MRI the next day, Hankins was examined on October 20 by W. Scott Bowen, M.D., an orthopedic surgeon in Little Rock. (Adm. R. 114-15, 122-23). Bowen diagnosed Hankins with a hamstring avulsion in his right hip and instructed him not to kneel, stoop, squat, push off, or jump on his right leg. (Adm. R. 115). Bowen prescribed anti-inflammatory medication and released Hankins from work for three weeks until a re-evaluation could be done. (*Id.*). Three weeks later, on November 10, Bowen re-examined Hankins and explained to him that it might take up to three months for his hamstring tear to heal enough to allow him to perform the

---

[1] Hankins' job description also noted that the position regularly required a person, *inter alia*, to lift and move up to 200 pounds on occasion. (Adm. R. 382-83).

required 300-meter run in one minute. (Adm. R. 113). At some point during this time, Hankins began attending physical therapy sessions. (Adm. R. 318). During the next follow-up, on December 8, Bowen encouraged Hankins to continue physical therapy with the goal of being released in one month, fully capable of performing the 300-meter sprint within the required time. (Adm. R. 112). By January 11, 2010, however, Bowen opined that it was unlikely that Hankins would ever be able to complete the 300-meter run in the required time, even though the injury might continue to improve slightly. (Adm. R. 110). Because of this, Bowen put Hankins on permanent restriction, barring all running or jumping, while opining that it would be reasonable for Hankins to work a desk or participate in light duty. (*Id*.).

At some point before the end of January 2010, Stephens terminated Hankins, apparently because he was unable to run the required 300-meter sprint in the allotted time. (Adm. R. 208, 328, 351). On February 10, 2010, Bowen advised Standard in writing of Hankins' permanent restrictions and his light duty recommendation. (Adm. R. 274). Soon thereafter, on March 9, Standard Vocational Case Manager Karol Paquette filed an "Own Occupation Review" concerning Hankins in order to "clarify the material duties and physical demands of [Hankins'] job to determine the Own Occupation." (Adm. R. 358).[2] In the review, Paquette analyzed the Policy language and the duties and physical demands of Hankins' specific position, determining, *inter alia*, that Hankins was a high level security manager and that Stephens maintained unusually high standards – physical and otherwise – for its security personnel. (Adm. R. 359-60). Paquette also determined that, while Standard viewed its security personnel "like a private police force," Hankins' arrest authority did not extend beyond that of a regular citizen. (Adm. R. 360) (quoting Stephens representative Dan

---

[2]Paquette is a certified rehabilitation counselor with a Master of Science in Rehabilitation Counseling. (Adm. R. 380).

Smith). Paquette then opined that Hankins' "Own Occupation" was best represented by the occupation "Security Manager (Alternate Title) Any Industry" (Security Manager) in the Department of Labor's Dictionary of Occupational Titles (DOT)[3] because the material duties of the DOT position were consistent with the official summary of Hankins' job description, most of his listed duties, and the high level of management required for his position. (Adm. R. 360-61).[4] While Paquette noted that the physical demands of Hankins' position were "clearly beyond" the Security Manager DOT position, which was classified as sedentary in nature, she concluded that Standard was not limited to looking at Hankins' job alone, as per the Policy language. (Adm. R. 361). She also noted that Stephens' physical requirements for security personnel were not consistent with national standards, Arkansas certification requirements, and "not likely consistent with other state certification requirements." (Adm. R. 362). Thus, she opined that "it would be reasonable that [Hankins] could obtain employment as a Security Manager elsewhere in the national economy, as the occupation is generally performed." (*Id*.).

Standard also hired John Hart, D.O., an osteopathic physician and independent contractor, to review Hankins' medical records and respond to various questions from Standard. (Adm. R. 208-17). Hart submitted his report on March 19, 2010. (Adm. R. 208). In the report, Hart labeled Hankins' position as security director as sedentary, although he noted that Stephens required Hankins to run 300 meters in under 66 seconds. (*Id*.). Hart also set out Hankins' medical history

---

[3]The DOT, a "result of over fifty years of occupational data collection and evaluation," combines "various jobs into 'occupations' based on their similarities." *Dionida v. Reliance Standard Life Ins. Co.*, 50 F. Supp. 2d 934, 939-40 n.4 (N.D. Cal. 1999) (citing Dep't of Labor, *Dictionary of Occupational Titles* at xv, xvii (4th ed., rev. 1991)). Thus, a DOT "'occupation' . . . covers more than one particular job." *Id*.

[4]Paquette lists the Security Manager DOT position number as 189.167-050. (Adm. R. 361). The regular title for this position is "Superintendent, Plant Protection (any industry)." Dep't of Labor, *Dictionary of Occupational Titles* 154 (4th ed., rev. 1991)).

from the time of the injury until the report, noting that while Bowen had stated in November and December 2009 that he believed Hankins would be able to run 300 meters within three months, Bowen had revised this opinion in January 2010, declaring that such an action was permanently unlikely. (Adm. R. 208-09). In response to questions, Hart stated that an individual in Hankins' situation should not have been precluded from working in any capacity, and that such a person should have been able to return to sedentary work within one week of the injury and to light work within two weeks of the injury. (Adm. R. 209-10). Finally, when asked when he would anticipate a material change in Hankins' condition, Hart responded that he agreed with Bowen's earlier assessment that 300 meters would be possible within three months, although the report is ambiguous as to whether Hart was referring to Hankins or to a hypothetical individual in Hankins' earlier situation. (Adm. R. 210). In answering this question, Hart did not mention Bowen's later re-assessment of Hankins' situation, where Bowen declared that 300 meters was likely a permanent impossibility. (*Id.*).

On April 8, 2010, Standard advised Hankins in a letter that it had denied his claim for long-term disability benefits because he was not disabled under the Policy's "Own Occupation" definition. (Adm. R. 317-21). In the letter, Standard stated that as part of its review it had analyzed the Policy, Hankins' medical records, Hart's report, and Paquette's report. (*Id.*). Standard summarized the information from those sources, and in the end it embraced Paquette's conclusion that Hankins' "Own Occupation" was best described by the DOT Security Manager position. (Adm. R. 317-19). Standard concluded by stating that, while it acknowledged that Hankins could not maintain his own position because of the physical demands, it did not find sufficient evidence or documentation that his injury would prevent him from performing his "Own Occupation" for other employers. (Adm. R. 320).

5

As of May 24, 2010, Hankins was still experiencing muscle spasms related to the hamstring injury, and Bowen advised him to continue physical therapy and medication. (Adm. R. 109). On July 28, Hankins was discharged from physical therapy after meeting all of his goals and reporting no pain other than discomfort from sitting and driving on a recent vacation. (Adm. R. 132). The next day, Bowen released Hankins from his care without recommending any further treatment, in part because an MRI had revealed that there was no new hamstring tear and in part because of the improvement seen in therapy. (Adm. R. 105). Bowen did not lift the permanent running and jumping restrictions, however, and he noted that Hankins still favored his right side when he walked and experienced some discomfort in the hamstring. (*Id.*).

On October 7, 2010, Hankins requested, through his attorney, that Standard provide him the entire file regarding his claim. (Adm. R. 304). The parties dispute whether Standard has complied.

On December 8, 2010, Robert White, a vocational specialist, interviewed Hankins at Hankins' request in order to prepare a vocational assessment.[5] (Adm. R. 350). In the subsequent assessment, White disagreed with Standard's decision for two reasons. (Adm. R. 353). First, White pointed out that Hankins' essential job duties included numerous physically demanding activities. (*Id.*). Because of this, White argued, it was inappropriate for Standard to compare Hankins' position with that of a sedentary Security Manager; rather, Hankins' job should have been compared to a position classified, at minimum, in the medium category of physical work as defined by the DOT. (Adm. R. 353-54). White offered two other DOT descriptions – Public Safety Officer and Deputy Police Chief – as potential "Own Occupation[s]" that are classified as more physically demanding.

---

[5]White's qualifications include, *inter alia*, a Master of Science in Career and Guidance Counseling. (Adm. R. 356-57).

6

(Adm. R. 354).[6] Second, White faulted Standard for not taking Hankins' age into account in its decision, noting that under Social Security Administration standards, an injured 57-year-old might be found disabled if he is unable to do at least medium level work. (Adm. R. 350, 355).

On December 14, 2010, Hankins sent White's assessment and curriculum vitae to Standard, along with updated medical reports indicating Hankins' permanent restrictions, requesting that Standard overturn its previous denial of Hankins' claim. (Adm. R. 298-99). Soon thereafter, Standard hired Joseph Mandiberg, M.D., a physician and independent consultant, to review Hankins' records. (Adm. R. 96, 102-03).[7] On December 27, Mandiberg submitted his findings. (Adm. R. 96-98). Mandiberg concluded, based on Hankins' physical therapy reports from July 28, 2010, that Hankins was capable of performing a 300-meter test, although he was not capable of running and jumping as part of his job as a security officer. (Adm. R. 98). Mandiberg also concluded that Hankins was capable of medium level work as of July 24, 2010. (*Id*.). On February 1, 2011, Hankins requested all information relating to Mandiberg's review of Hankins' claim from Standard and a list of all past cases in which Standard had consulted Mandiberg. (Adm. R. 292). The parties dispute as to whether all relevant information was in fact provided.

On March 11, 2011, at the behest of Standard, Paquette authored another memorandum analyzing White's vocational assessment. (Adm. R. 343-47). In the report, Paquette determined that White's findings were irrelevant and did not change her opinion as to Hankins' "Own Occupation." (Adm. R. 345). Paquette stated that she came to this conclusion, *inter alia*, because White did not

---

[6]Public Safety Officer is listed as DOT No. 379.263-014 and Deputy Police Chief is listed as DOT No. 375.267-026, according to White. (Adm. R. 354). In actuality, DOT No. 375.267-026 is titled "Police Inspector I (government ser[vice])," with "division commander; field control inspector; and [senior] police captain" listed as alternative titles. Dep't of Labor, *Dictionary of Occupational Titles* 273 (4th ed., rev. 1991)).

[7]Mandiberg is certified by the American Board of Orthopedic Surgery. (Adm. R. 102-03).

specifically analyze Hankins' "Own Occupation,"[8] and because White based part of his assessment on Social Security Administration criteria and a regional economy, rather than a national economy. (Adm. R. 346). Paquette also asserted that White's choice of "Public Safety Officer" was clearly incorrect, as this designation was "for a government industry sworn law enforcement officer with full arrest authority," and Hankins was a private security officer with minimal arrest authority. (*Id*.). Paquette did not explicitly analyze White's recommendation of "Deputy Police Chief" as an alternative possibility. Paquette concluded by reaffirming her earlier assessment that Hankins' "Own Occupation" as it is generally performed in the national economy is sedentary and thus Hankins "would be able to obtain employment elsewhere." (Adm. R. 347).

On March 15, 2011, Standard notified Hankins by letter that it had completed an independent review of Hankins' original claim determination and subsequently provided information, and it was affirming its denial. (Adm. R. 282). In the letter, Standard explicitly embraced Paquette's second memorandum and her critique of White's assessment, criticisms, and recommendations, finding Paquette's assessment to be "well reasoned and supported by information in the claim file." (Adm. R. 284-87). Standard again acknowledged that Hankins' specific job had very high physical requirements, but it noted that "when determining Mr. Hankins' Own Occupation, we are looking at the way the occupation is generally performed in the national economy." (Adm. R. 286). Since Stephens' physical requirements were "not characteristic of how [Hankins'] occupation is performed in the general economy," and since Hankins' job summary focused on managerial and not physical duties, Standard asserted that comparing it to Security Manager was appropriate since Hankins' position summary was "remarkably similar to the job description for Security Manager." (*Id*.). In

---

[8]Paquette asserted that White performed "a transferable skills assessment rather than a specific analysis of the claimant's Own Occupation." (Adm. R. 346).

the end, Standard affirmed its denial and insisted that its "review was conducted fairly and objectively, taking into consideration all information in Mr. Hankins' claim file and all policy provisions applicable to his claim." (Adm. R. 288).

## II.

ERISA § 502(a)(1)(B) provides that "a participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) (2009).

Although ERISA contains no standard of review, the Supreme Court has held that a reviewing court should make a *de novo* review unless the plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109, 115, 109 S. Ct. 948, 953, 956-57, 103 L. Ed. 2d 80 (1989). If the plan grants the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the court reviews for an abuse of discretion. *Farfalla v. Mutual of Omaha Ins. Co.*, 324 F.3d 971, 973 (8th Cir. 2003) (citing *Firestone*, 489 U.S. at 115, 109 S. Ct. at 948). Here, the Policy states as follows:

> Except for those functions which the Group Policy specifically reserves to the Policyholder or Employer, we [Standard] have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy.
>
> Our authority includes, but is not limited to:
>     1. The right to resolve all matters when a review has been requested;
>     2. The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;
>     3. The right to determine:
>         a. Eligibility for insurance;
>         b. Entitlement to benefits;

9

>> c. The amount of benefits payable; and
> d. The sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.
>
> Subject to the review procedures of the Group Policy, any decision we make in the exercise of our authority is conclusive and binding.

(Adm. R. 34-35). Hankins argues that the Court should engage in *de novo* review because the Policy does not use the term "discretion" or contain any "language specifying that the fiduciary has discretionary authority to interpret the plan provisions." In support, he points primarily to *Baxter ex rel. Baxter v. Lynn*, where the Eighth Circuit held that *de novo* review was appropriate even though the plan in question gave the administrator "final authority to determine all matters of eligibility for the payment of claims." 886 F.2d 182, 188 (8th Cir. 1989).

First, contrary to Hankins' assertion, the Policy grants Standard "full and exclusive authority" to interpret the Policy. (Adm. R. 34). This fact alone takes *Baxter* out of the equation, as the Eighth Circuit in *Baxter* stated that it came to its conclusion because the plan under consideration did "not grant to the trustees the authority to construe ambiguous terms." *Baxter*, 886 F.2d at 188 (noting additionally that the Eighth Circuit "could find no other provision in the plan specifically giving the trustees the discretionary power to interpret the meaning of its subrogation clause.").

Second, while Hankins is correct that the word "discretion" does not appear in the Policy, the Policy nonetheless grants discretion to Standard. The Eighth Circuit has held that plan language granting an administrator sole responsibility for the administration and interpretation of a plan did indeed give the administrator discretionary authority. *Kennedy v. Georgia-Pacific Corp.*, 31 F.3d 606, 609 (8th Cir. 1994). Like *Kennedy*, the Policy language here clearly grants sole administrative and interpretive authority to Standard, thus it is discretionary. *See also McKeehan*, 344 F.3d at 792

(abuse-of-discretion standard applied when plan language granted the administrator full and exclusive authority to control, manage, administer, interpret, and resolve issues concerning the plan); *Whitmore v. Standard Ins. Co.*, No. 4:06CV1486, 2007 WL 1557371, at *1-2 (E.D. Mo. May 25, 2007) (finding that virtually identical plan language conferred administrative and interpretive discretion on Standard).

Even if the plan or policy grants discretion, the Eighth Circuit has held that a less deferential standard of review is warranted if a plaintiff can provide material, probative evidence to demonstrate "that: (1) . . . a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty . . . ." *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998), *abrogated on other grounds by Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008).[9] Under the *Woo* test, the "mere presence of a procedural irregularity is not enough to strip a plan administrator of the deferential standard of review." *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1031 (8th Cir. 2000), *abrogated on other grounds by Glenn*, 554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299. The procedural irregularity must also raise "serious doubts as to whether the result reached was the product of an arbitrary decision or the plan

---

[9]*Glenn* abrogated the *Woo* test with respect to conflicts of interest. *Glenn*, 554 U.S. at 108, 128 S. Ct. at 2346 (holding that "a reviewing court should consider [a conflict of interest] as a factor in determining whether the plan administrator has abused its discretion in denying benefits"). It remains to be seen, however, as to whether *Glenn* affected *Woo*'s holding that a procedural irregularity may change the standard of review. *Compare Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 581-82 (8th Cir. 2008) (explaining that, even under *Glenn*, the Eighth Circuit continues to examine procedural irregularities under the two-part *Woo* test), *with Chronister v. Unum Life Ins. Co. Of Am.*, 563 F.3d 773, 776-77 (8th Cir. 2009) (analyzing procedural irregularities as factors under *Glenn*'s abuse of discretion standard). *See also Wrenn v. Principal Life Ins. Co.*, 636 F.3d 921, 924 n.6 (8th Cir. 2011) (explicitly declining to decide whether *Glenn* changed the *Woo* procedural irregularity test, but noting that *Woo* may still apply in the Eighth Circuit). This Court will continue to apply *Woo* to procedural irregularities so long as that portion of *Woo* has not been overruled.

administrator's whim." *Buttram v. Cent. States Se. & Sw. Areas Health & Welfare Fund*, 76 F.3d 896, 900 (8th Cir.1996). This second requirement is a "considerable hurdle" for plaintiffs. *Torres v. UNUM Life Ins. Co. of Am.,* 405 F.3d 670, 679 (8th Cir. 2005) (quotation omitted).

Hankins argues that roughly five Standard actions are procedural irregularities. First, he asserts that Standard relied on a faulty vocational assessment by Paquette – faulty because it failed to consider any of his essential duties at Stephens that involved physical demands. Second, he argues that Standard relied upon the fact that Hankins did not have legal authority to make arrests rather than on the fact that Stephens required Hankins to have the physical ability to make arrests. Third, he argues that Standard chose to give its own physicians and vocational case manager more weight than his treating physician and White's vocational assessment. Fourth, Hankins argues that Standard has failed to produce certain information relevant to its decision to deny benefits. Fifth, Hankins argues that Standard chose to focus solely upon the DOT, rather than looking at Hankins' actual job, in making its "Own Occupation" determination.

Standard counters by arguing that all of these contentions have been misconstrued as procedural arguments when they are, in reality, substantive arguments that go to the merits of Standard's decision to deny benefits. With the exception of Hankins' failure-to-provide-information argument, Standard is correct. In *Weidner v. Federal Express Corp.*, the Eighth Circuit emphasized that "procedural irregularity" refers "to the sorts of external factors that are sufficient under the common law of trusts to call for application of a less deferential standard of review." 492 F.3d 925, 928 (8th Cir. 2007) (quotation omitted). In *Weidner*, the claimant argued that procedural irregularities existed because the plan administrator had disregarded her treating physician's opinion, failed to consider relevant information, and relied on outdated information. *Id*. The Eighth Circuit found these contentions to be misdirected "because they reflect substantive disagreements with the

Committee's analysis of the administrative record, not procedural irregularities." *Id.* Much like *Weidner*, four out of five of Hankins' arguments are substantive disagreements with Standard's analysis of information in the record. They are therefore not properly classified as procedural irregularities. *See id.* at 928-29 ("The record discloses nothing irregular in the Committee's gathering and considering the substantive evidence.").[10] This is not a statement on the validity of the four arguments; they will be considered when the Court analyzes the substance of Hankins' claim.

Based on the above reasoning, however, Hankins final argument – that Standard has failed to provide certain information, either in the administrative record or to Hankins – *is* an argument for a procedural irregularity. Hankins makes this argument concerning two separate pieces of information. The Court will address each of these in turn.

Hankins first argues that Standard has failed to provide the notes and full substance of a phone conversation between Paquette and Smith, a Stephens representative. Standard counters by

---

[10]Procedural irregularities found or mentioned by the Eighth Circuit include a plan administrator: acting dishonestly, *Buttram*, 76 F.3d at 900, acting from an improper motive, *Id.*, not producing a written decision for the claimant and court to review, *Id.*, failing to send the administrative file to an appropriate entity, *Sheehan v. Guardian Life Ins. Co.*, 372 F.3d 962, 967 (8th Cir. 2004), deciding to deny a claim before receiving information necessary to evaluate the claim, *Id.,* not establishing and maintaining reasonable claim procedures, *Menz v. Proctor & Gamble Health Care Plan*, 520 F.3d 865, 869 (8th Cir. 2008), requiring a claimant to file more than two appeals, *Id.*, withholding relevant information before the claimant's appeal hearing, *Torres*, 405 F.3d at 679, and leading a claimant to believe it was relying on certain documents in the administrative record while the administrator never actually obtained those documents. *Id.* These are all issues outside the realm of weighing evidence that exists in the administrative record. Admittedly, the Eighth Circuit does not always draw a rigid line between information in the administrative record and information outside of the administrative record when discussing procedural irregularities. *See, e.g., Buttram*, 76 F.3d at 900 (noting that a procedural irregularity can occur if a plan administrator "fails to use judgment in reaching his decision"). Even so, the Court still believes it best to relegate four of the five arguments to the substantive discussion at hand, as per *Weidner*.

observing, correctly, that the administrative record already includes two paragraphs of Paquette's notes describing the substance and details of her conversation with Smith. *See* Adm. R. 379. Hankins provides nothing to show that these notes do not detail the conversation in full, or that a more complete record exists (e.g. an audio copy), so the assertion is without merit.

Hankins next argues that Standard has refused to provide a list of all previous cases in which Standard retained the consultants that it used in Hankins' case. Standard admits that it has not provided the information, but observes, correctly, that Hankins has pointed to nothing in the Policy, the ERISA statutes, or the applicable regulations, that imposes upon Standard the duty to provide such information. Without a duty, there cannot be a procedural irregularity. Hankins cites no authority for the proposition that a plan administrator or insurer must provide a list of all cases in which a consultant has been engaged.[11]

Even if the failure to provide a list of all cases reviewed by the outside professionals who reviewed Hankins' claim was a procedural irregularity, that would not end the inquiry. Hankins would also have to show that the procedural irregularity "caused a serious breach of the plan administrator's fiduciary duty . . . ." *Woo,* 144 F.3d at 1160. This second requirement presents a "considerable hurdle" for Hankins, which he has not overcome. *See Chronister v. Baptist Health*, 442 F.3d 648, 655 (8th Cir. 2006) (noting that, in order to strip a plan administrator of deference, a procedural irregularity must be so egregious as to trigger a total lack of faith in the integrity of the decision-making process).

### III.

Because Hankins has not demonstrated the existence of a procedural irregularity that caused

---

[11]Hankins does not argue, for instance, that Standard's failure to provide this information is a violation of the applicable regulations, which can be found in 29 C.F.R. § 2560.503-1.

a serious breach of Standard's fiduciary duty, the Court reviews to see whether Standard abused its discretion. Under the traditional abuse-of-discretion analysis, the proper inquiry is whether the plan administrator's decision was reasonable, or supported by substantial evidence. *Ortlieb v. United HealthCare Choice Plans*, 387 F.3d 778, 781 (8th Cir. 2004) (citation omitted). "Substantial evidence is 'more than a scintilla but less than a preponderance.'" *Smith v. UNUM Life Ins. Co. of Am.*, 305 F.3d 789, 794 (8th Cir. 2002) (quoting *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 949 (8th Cir. 2000)). Stated differently, substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fletcher-Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001) (quotation omitted). Relevant evidence includes "all comments, documents, records, and other information submitted by the claimant relating to the claim." 29 C.F.R. § 2560.503-1(h)(2)(iv). An administrator's decision is reasonable if a reasonable person could have reached a similar decision given the evidence in the record, not whether a reasonable person necessarily would have reached that decision. *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002). While abuse of discretion review is deferential in the ERISA context, it "is not tantamount to rubber-stamping the result." *Torres*, 405 F.3d at 680.

Under an abuse-of-discretion analysis, the Court must defer to an administrator's reasonable plan interpretation "even if the court would interpret the language differently as an original matter." *Darvell v. Life Ins. Co. of N. Am.*, 597 F.3d 929, 935 (8th Cir. 2010). To determine reasonableness, the Court looks at whether the administrative interpretation: (1) is contrary to the plan's clear language; (2) conflicts with ERISA's substantive or procedural requirements; (3) renders plan language "meaningless or internally inconsistent;" (4) is consistent with plan goals; and (5) has been followed consistently by the administrator. *Id.* (citing *Finley v. Special Agents Mut. Benefit Ass'n*, 957 F.2d 617, 621 (8th Cir. 1992)).

15

Hankins' primary argument is that Standard abused its discretion by making an unreasonable interpretation of the Policy. More specifically, Hankins argues that the Policy required Standard to look at Hankins' actual job duties first, and then to look at how those duties are performed in the national economy. Hankins argues that Standard instead decided how Hankins' "Own Occupation" should be construed almost entirely from looking at the national economy as represented by the DOT. This over-reliance on the DOT, Hankins argues, resulted in his "Own Occupation" being classified as sedentary despite the fact that his employer imposed strenuous physical requirements. Standard responds to these specific arguments by essentially arguing the inverse: that Hankins over-relied on the duties of his Stephens job by not taking into account what "Own Occupation" actually means. According to Standard, "Own Occupation" is broader than just a claimant's specific job. Rather, Standard posits, the Policy and case law make it clear that it is both reasonable and necessary to construe "Own Occupation" as referencing how the occupation is performed in the national economy. Thus, Standard contends that under the Policy Hankins must show not only that he was unable to perform his job for his specific employer, but also that he would be unable to perform his "Own Occupation" as it is generally performed in the national economy.

The Policy defines "Own Occupation" as:

[A]ny employment, business, trade, profession, calling, or vocation that involves Material Duties of the same general character as the occupation you are regularly performing for your Employer when Disability begins. In determining your Own Occupation, we are not limited to looking at the way you perform your job for your Employer, but we may also look at the way the occupation is generally performed in the national economy. If your Own Occupation involves the rendering of professional services and you are required to have a professional or occupational license in order to work, your Own Occupation is as broad as the scope of your license.

Material Duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or

16

omitted. . . .

(Adm. R. 19).[12] Thus, the Policy definition of "Own Occupation" explicitly provides that Standard is "not limited to looking at the way you perform your job for your Employer, but we may also look at the way the occupation is generally performed in the national economy." Furthermore, the term "Material Duties" is defined to mean the duties "generally required by employers" for the particular occupation "that cannot reasonably be modified or omitted." Although Stephens requires its director of commercial security to have the ability to engage in strenuous physical activity, Hankins has not shown and does not argue that private employers in the national economy generally require persons employed to direct and manage security operations to have that ability. In concluding that private employers in the national economy do not generally impose such strenuous physical requirements, Standard looked to the DOT, which is not an abuse of discretion. "We agree with the district court that Hartford's use of the Dictionary [of Occupational Titles] to determine Osborne's "own occupation" was not arbitrary and capricious, but on the contrary was 'reasonable.'" *See Osborne v. Hartford Life and Acc. Ins. Co.*, 465 F.3d 296, 299 (6th Cir. 2006). *See also Darvell*, 597 F.3d

---

[12]Most of the cases cited to by either party involved long-term disability plans without a specific definition of "occupation," "own occupation," or "regular occupation." *See, e.g., Darvell*, 597 F.3d at 935 ("The plan here does not define 'regular occupation.'"); *Osborne*, 465 F.3d at 302 (Cole, J., dissenting) (noting that the policy in question did not define "own occupation"); *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1179-80 (D. Kan. 2010 (noting that since the Court could not find an alleged "own occupation" definition in the administrative record, it was forced to conclude that the plan in question did not define the term); *Whitmore v. Standard Ins. Co.*, 527 F. Supp. 2d 913 (W.D. Mo. 2007) (referencing no specific policy language or definition of "own occupation"); *Ayer v. Liberty Life Assur. Co. of Boston*, 382 F. Supp. 2d 162, 178 (D. Me. 2005) ("When the term 'occupation' is undefined, courts properly defer to the DOT definition . . . ."); *Ehrensaft v. Dimension Works Inc. Long Term Disability Plan*, 120 F. Supp. 2d 1253 (D. Nev. 2000) (proceeding as if no policy language existed defining "occupation"). As Hankins' Policy provides a thorough definition of "Own Occupation," these cases are only marginally relevant, at best, as are cases cited concerning plans that contain very different "occupation" definitions. *See, e.g., Zappier v. Sun Life Assur. Co. of Can.*, No. 05 Civ. 5300, 2006 WL 2621110 (S.D.N.Y. Aug. 10, 2006).

at 936 (quoting *Osborne* with approval).

According to the DOT, the occupation of Security Manager is sedentary. It is undisputed that Hankins has the ability to engage in sedentary work. *See, e.g.,* Adm. R. 110 (opining by Bowen that Hankins could reasonably work a desk or participate in light duty). Hence, he was not and is not disabled from engaging in his "Own Occupation," even though he was and is unable to meet the physical requirements for employment at Stephens.

Hankins argues that a conflict of interest exists because Standard has the authority to determine his eligibility for long-term disability benefits while also serving as the insurance company that would pay off the claim. Standard responds by arguing that Hankins has not demonstrated that the conflict actually impacted the outcome of his case. Standard also argues that its determination was obviously appropriate, thus the conflict can be ignored because it would not serve as a tie-breaking factor.

A conflict exists when the "plan administrator both evaluates claims for benefits and pays benefit claims." *Khoury v. Group Health Plan, Inc.*, 615 F.3d 946, 953 (8th Cir. 2010) (quoting *Glenn*, 554 U.S. at 112, 114, 128 S. Ct. at 2348-49). A conflict of interest is "one factor among many that a reviewing judge must take into account" in analyzing a claimant's argument that a plan administrator abused its discretion. *Glenn*, 554 U.S. at 116, 128 S. Ct. at 2351. A conflict should be given more weight "where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Id.* at 117. Less weight, or no weight at all, should be given to a conflict of interest "where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective

18

of whom the inaccuracy benefits." *Id.* Here, taking into account Standard's conflict of interest as the party that both evaluates and pays claims, the Court does not find that Standard abused its discretion.

Hankins argues that Standard, in evaluating his claim, failed to take into account that Hankins should be considered of "advanced age." As Standard correctly notes, however, it was not obligated by the Policy, ERISA, or case law to apply Social Security Administration standards concerning age in determining Hankins' "Own Occupation" or disability. More importantly, the issue is not whether Hankins is disabled from engaging in any occupation; rather, the issue is whether he is disabled from engaging in his own occupation. If Hankins were disabled from engaging in his own occupation, his age might be a relevant consideration in determining whether he were disabled from engaging in any occupation because of the potential need for retraining for a new occupation, but that is not the case here.

Hankins' final argument is that Standard gave too much weight to its independent medical consultants and too little weight to the opinion of Bowen, Hankins' treating physician. This argument is without merit, as Standard was not required to give any special deference to the opinion of Hankins' treating physician over the conflicting opinion of a reviewing physician. *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 925 (8th Cir. 2004). Regardless, even if Bowen's opinions were accepted as conclusive, the outcome could not be changed as Bowen himself opined that Hankins could perform light duty, and the Court has determined that it was reasonable for Standard to view Hankins' "Own Occupation" as sedentary.

## CONCLUSION

For the reasons stated, Standard's determination that Hankins is not eligible to receive long-term disability benefits is affirmed.

IT IS SO ORDERED this 1st day of November, 2011.

                                                          _____
                                                          J. LEON HOLMES
                                                          UNITED STATES DISTRICT JUDGE